| | | |
|---|---|---|
| JAMES GASTON | ) | |
| | ) | |
| Plaintiff, | ) | No. 11-cv-6612 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| PARTHASARTHI GHOSH, LIPING | ) | |
| ZHANG, IMHOTEP CARTER, | ) | |
| WEXFORD HELATH SOURCES, INC., | ) | |
| AND SALEH OBAISI, M.D. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Gaston, a prisoner at Stateville Correctional Center, brings this civil-rights lawsuit, 42 U.S.C. § 1983, for violation of his Eighth Amendment rights.[1] Defendants are Wexford Health Sources, Inc., a private corporation that provides medical services at Stateville; three current and former Stateville medical directors; and one former Stateville staff physician. For the reasons explained below, the Court grants summary judgment in favor of each defendant and against Gaston.

## I. Background

This case arises out of the treatment of James Gaston's various medical problems—a course of treatment "spanning eight years, three serious medical

---

[1] This Court has subject-matter jurisdiction over the case under 28 U.S.C. § 1331.

conditions, and four surgeries." R. 178, Pl. Resp. at 1.[2] For the sake of clarity, the Court will address each medical condition separately, though they overlap chronologically. The facts narrated here are undisputed unless otherwise noted. The Court views the evidence in the light most favorable to Gaston, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. Left Knee

In early May 2009, Gaston injured his left knee while playing basketball at the prison. R. 159, DSOF ¶ 9; DSOF Exh. B at 27:21-23.[3] On May 11, 2009, Gaston complained of knee pain to physician's assistant La Tanya[4] Williams (who is not a defendant). DSOF ¶ 9. X-rays were ordered, which showed degenerative changes in the left knee. R. 180, PSOF ¶ 3. To deal with the knee pain, Williams ordered a knee brace for Gaston, and also ordered him to take Motrin and to apply ice. *Id*. Later that summer, then-medical director Dr. Parthasarathi Ghosh saw Gaston at a Hepatitis C clinic. PSOF ¶ 4. It is not clear whether Gaston complained to Ghosh about knee pain at that appointment. In the medical records, Ghosh listed "[left] knee brace" under "Plans," but did not make any other notes about Gaston's knees.

---

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Defendants' Statement of Facts [R. 159], "PSOF" for Gaston's Statement of Facts [R. 180], "Pl. Resp. DSOF" for Gaston's response to the Defendants' Statement of Facts [R. 173], and "Def. Resp. PSOF" for the Defendants' response to Gaston's Statement of Additional Facts [R. 186]. When the facts are undisputed, only the asserting party's Statement of Facts is cited. Gaston has also filed supporting exhibits for his Statement of Facts. The version of the supplemental exhibits filed at R. 197 is identified as "Pl. Supp. Exh." The non-numbered version, which contains additional exhibits, is identified by its docket number, R. 187.

[4]Gaston spells Williams's first name as "LaTonya," *see* Third Am. Cmplt. at ¶ 8, but Defendants spell her name as "La Tanya," *see* Def. Mem. at 9. Because Wexford employs Williams, this Opinion will use the defense spelling.

R. 197, Pl. Supp. Exh. at 16. Gaston, however, testified that his knee continued to be painful, and that it would swell up and give out on him. DSOF Exh. B at 31:16-32:11.

In September 2009, Gaston made an appointment to see a physician during sick call. PSOF ¶ 6. But due to staff shortages and a Stateville lockdown, he did not see a doctor until November 2009, when he presented for an appointment with Dr. Liping Zhang. PSOF ¶¶ 7-10; Pl. Supp. Exh. at 21-22. Zhang examined Gaston, noting that there was no bruising of the left knee and that Gaston had full range of motion, but that he favored the knee while walking. DSOF ¶ 10; DSOF Exh D. at 3. Zhang prescribed Ibuprofen (which is a non-steroidal anti-inflammatory drug) to treat the pain and inflammation, as well as an analgesic balm. *Id*.[5] Zhang did not refer Gaston to a specialist at this appointment, and instead told him to return to the clinic in two months (though Zhang did not schedule the follow-up). PSOF ¶ 10.[6] Gaston next complained to Zhang of knee pain in April 2010, when he presented at the health care unit for the Hypertension and Asthma Chronic Clinics. DSOF ¶ 11. At this appointment, Gaston again complained about his left knee. *Id*. Gaston states

[5]In Gaston's response to Defendants' description of this appointment, he states "Admitted in part: However, Dr. Zhang refused to offer meaningful treatment to plaintiff, telling him 'I'm not treating you, and I am not letting you see a specialist.'" Pl. Resp. DSOF ¶ 10. But Gaston does not dispute the accuracy of the medical records recording Zhang's prescribed treatment for the knee, so the denial must specifically be directed at the refusal to refer him to an outside specialist.

[6]In response to Gaston's assertion about the specialist, Defendants state: "Denied that Dr. Zhang refused to send Plaintiff to an off-site specialist, as it was not medically necessary." Def. Resp. PSOF ¶ 10. It is unclear whether defendants are denying that Zhang refused to refer Gaston to a specialist (a contention unsupported by the record) or whether they are opining that a specialist appointment was medically unnecessary at the time of the appointment. In any event, there is no evidence in the record that Zhang ordered a specialist referral during the November appointment.

that Zhang refused to examine his knee or to discuss it with him when he asked her to. *Id*. Defendants deny that Zhang refused to examine Gaston's knee, and note that Zhang prescribed Tramadol,[7] which is an opioid pain reliever, and an analgesic balm. R. 186, Def. Resp. PSOF ¶ 11.[8] Again, Zhang did not refer Gaston to a specialist, but rather told him to follow up at the clinic. PSOF ¶ 13. Gaston reports that he asked about a specialist referral, but Zhang told him "I don't want to talk to you about that. That ain't what you're here for." DSOF Exh. B at 35:24-36:5. Gaston further asserts that at one of these two appointments (it is unclear which one), Zhang told him "I'm not treating you, and I'm not letting you see no specialist." DSOF Exh. B at 56:19-21.

Gaston followed up at the clinic about two weeks later, when he saw Williams and reported that his left knee was getting worse. DSOF ¶ 12. Williams referred Gaston to Ghosh for further evaluation. *Id*. On May 19, 2010—now more than a year after Gaston's initial injury—Ghosh examined Gaston. DSOF ¶ 13. Ghosh noted Gaston's history of pain, instability and swelling since May 2009, and planned to refer him for an orthopedic consult at the University of Illinois at Chicago (UIC). DSOF ¶ 13; PSOF ¶ 16. It took Ghosh until July 15, 2010—about two months—to actually sign the order approving the orthopedic consult. PSOF ¶ 17. Then there was another delay of several months until the consult took place, during which

---

[7]In the medical records, Zhang notes that she is prescribing "Ultram," which is a brand name for Tramadol. DSOF Exh. D at 4.

[8]Gaston makes word-for-word the same denial regarding "meaningful treatment" as described in note 5, *supra*. Pl. Resp. DSOF ¶ 11. But the medical records reflect that Zhang prescribed the treatment described, DSOF Exh. D at 4, and Gaston does not directly deny it.

Gaston grieved the treatment of his knee and continued to complain of knee pain to Stateville medical personnel. PSOF ¶¶ 19-23.

In the end, the orthopedic consult did not take place until September 27, 2010, when Gaston saw Dr. Samuel Chmell, an attending orthopedic surgeon at UIC. PSOF ¶ 25. At this appointment, Chmell noted a possible left meniscal injury and ordered x-rays and an MRI to further evaluate the potential injury. DSOF Exh. D at 11. But Gaston was not referred to UIC for an MRI until late November 2010, and the MRI did not take place until February 4, 2011. PSOF ¶¶ 29, 32. Gaston met with Ghosh on March 25, 2011 to discuss the results of the MRI. DSOF ¶ 18. Ghosh planned another orthopedic referral. PSOF ¶ 35. Ghosh retired shortly after this appointment. DSOF ¶ 18.

On June 6, 2011, Gaston returned to UIC for another appointment with Chmell. DSOF ¶ 19. After reviewing the MRI, Chmell recommended a left knee arthroscopy, which is an elective outpatient procedure, to repair or remove damaged tissue in the knee. *Id*. Gaston agreed to undergo this surgery. *Id*. Wexford approved Gaston for the left knee arthroscopy in July 2011, and Chmell performed the surgery on August 2, 2011. PSOF ¶ 43; DSOF ¶ 21.

At a follow-up appointment on August 8, 2011, Chmell noted that Gaston was doing well, ordered physical therapy, and gave him instructions on exercises to do in his cell. DSOF Exh. D at 21-22.[9] Gaston was never given physical therapy for his

_____

[9]Defendants state that Chmell ordered only exercises, not formal physical therapy. DSOF ¶ 22. Chmell's notes from the appointment state that "[w]e gave his some physical therapy exercises to do in clinic. We ordered Physical Therapy for him to have at the prison." DSOF Exh. D at 22-23. Based on this record, it seems like formal physical therapy

left knee. PSOF ¶ 47. Even so, it appears that the left knee arthroscopy was a success: Gaston did not complain about left knee pain again until four years later, in October 2015. DSOF ¶ 51.

## B. Right Knee

Gaston began complaining of right knee pain sometime in 2010, but there is no evidence that Ghosh or the other defendants were aware of the right knee issue until much later. Gaston filed a grievance mentioning his right knee pain in August 2010, but there is no indication that Ghosh knew about the grievance. *See* DSOF Exh. G at 3-9. Gaston points to a letter that he wrote to Ghosh on December 1, 2010, stating that he had been waiting 18 months for left knee treatment, and that "my other knee is getting bad from the pressure and extra weight." Pl. Supp. Exh. at 1-2. But the foundation for this letter (either its authorship by Gaston or its receipt by Ghosh) is not in the record. Gaston's Local Rule 56.1 Statement paragraph on this letter cites only a purported copy of the letter, and fails to cite any factual support, whether it be deposition testimony (or even an affidavit) of Gaston, or an admission by Ghosh that he received the letter. PSOF ¶ 30. As Defendants point out, there is no reason to think that this letter was ever received by Ghosh. Def. Resp. PSOF ¶ 30. Gaston did complain of right knee pain to Williams on December 17, 2010, DSOF ¶ 16, but there is no evidence that Ghosh or any of the other defendants knew about this complaint. There is also no evidence that Gaston complained to Ghosh or other medical personnel about his right knee

---

was ordered. To the extent that the record is ambiguous, it must be read in the light most favorable to Gaston, which means that Chmell did order physical therapy (not just exercises) during the August 8 appointment.

between December 2010 and August 2011. Indeed, it is not clear that Ghosh *ever* knew about the right knee complaint (Ghosh retired in March 2011, DSOF ¶ 2).

On August 8, 2011, at an appointment with Chmell after the left knee arthroscopy, Gaston complained of right knee pain. Chmell noted that he would likely order an MRI of Gaston's right knee at their next appointment, and that he would see Gaston again in two weeks. DSOF Exh. D. at 23. This follow-up appointment was never scheduled. Instead, in an August 25, 2011 appointment, Stateville's new medical director, Dr. Imhotep Carter, noted that there was "no current indication for a right knee evaluation." DSOF Exh. D at 24. In November 2011, Carter presented Gaston's case at a Wexford collegial review. DSOF ¶ 24. Collegial review is a discussion between the Stateville medical director and a Wexford utilization management physician to determine a patient's treatment plan. *Id*. The collegial review decided to postpone an MRI of the right knee for six months "to allow surgically repaired left knee to recover." DSOF Exh. D at 25.

Gaston next presented for an evaluation with Carter in February 2012. Carter noted that Gaston was walking with a crutch and "Basically NWB [non-weightbearing] on his right LE [lower extremity]." DSOF Exh. D at 26. Carter reminded Gaston of the plan to delay the MRI of his right knee for six months, and renewed his medical permits and prescriptions. DSOF ¶ 25. Carter left Stateville shortly after this exam.

In May 2012, the interim medical director (not a defendant in this case) referred Ghosh for an MRI of his right knee, which took place in July 2012. DSOF

¶ 27-28. The MRI showed degenerative tears of the medial and lateral meniscus, a joint effusion, and some osteochondral fragments within the joint. DSOF Exh. D at 31. Based on the MRI results and an examination, Chmell recommended a right knee arthroscopy. DSOF ¶ 28. Dr. Saleh Obaisi became medical director of Stateville on August 2, 2012, and approved the right knee arthoscopy on August 8, 2012. DSOF ¶ 29, DSOF Exh. D at 33. The surgery was performed on October 2, 2012. DSOF ¶ 30. Gaston underwent several months of physical therapy after the surgery. DSOF ¶¶ 32, 34.

In December 2012, Obaisi approved a follow-up orthopedic consultation at UIC. PSOF ¶ 69. This consultation was approved in a Wexford collegial review on January 7, 2013, but the consultation did not take place until June 17, 2013. DSOF ¶¶ 36-37. Neither party explains why it took six months to schedule this appointment. During the appointment, Gaston complained of pain despite receiving medication and physical therapy. DSOF ¶ 37. Chmell gave Gaston a steroid injection, recommended further physical therapy, and noted that if non-operative measures were unsuccessful, Chmell would consider recommending a full knee replacement. *Id*. When Gaston returned to UIC in October 2013, he was still experiencing knee pain, so Chmell recommended a right knee arthroplasty (in other words, a full knee replacement). DSOF ¶ 39. Obaisi and the Wexford collegial review approved the arthroplasty within a month. PSOF ¶ 79; Pl. Supp. Exh. at 324.

Unfortunately, the arthroplasty was long delayed. At least some of the holdup was due to the need for Gaston to get pre-surgery clearance from the pulmonary and cardiology departments at UIC to ensure that he was fit for surgery. DSOF ¶¶ 41-42. It is unclear when the pre-surgical clearance process ended. Gaston was cleared by cardiology in May 2014, PSOF ¶ 86, but the parties have pointed to no evidence of the date of pulmonary clearance.[10] In any event, during the time that Gaston waited for the surgery, he was seen regularly by medical staff and provided with pain medication, muscle relaxants, crutches, medical permits for low-bunk/low-gallery, and supportive knee braces. DSOF ¶ 42.

After more than a year of waiting, Gaston returned to Chmell's office for a pre-surgery consult in December 2014. DSOF ¶ 43. The right knee replacement was performed on February 3, 2015, and was apparently successful. DSOF ¶ 44. Gaston had frequent follow-up appointments with Obaisi in the year after the surgery, and received multiple courses of physical therapy. DSOF ¶¶ 48-50. An August 2016 follow-up appointment with Chmell revealed that Gaston was healing well from the arthroplasty, despite continued pain. DSOF ¶ 53.

### C. Lower Back

Gaston first reported lower back issues on February 3, 2014, when he complained to Obaisi of numbness in his left thigh. DSOF ¶ 55. Obaisi ordered x-rays of the lumbar spine and left hip. *Id.* Williams reviewed the x-rays with Gaston and diagnosed him with mild degenerative joint disorder of the lumbar spine. DSOF

---

[10]The medical record contains a "Pulmonary Note" dated July 23, 2014. DSOF Exh. D at 86. This report states that "surgery is not contraindicated." *Id.* at 89. But neither party explains whether this report definitively cleared Gaston for surgery.

¶ 56. She prescribed Mobic and Robaxin, and referred Gaston to Obaisi. DSOF ¶ 56; PSOF ¶ 83; DSOF Exh. D at 156. Obaisi saw Gaston in late March and scheduled him for a steroid injection, which took place in early April 2014. DSOF ¶ 57.

In August 2014, Gaston heard a "pop" while bench pressing weights. DSOF ¶ 58. Gaston saw a nurse at the health care unit about the injury. *Id*. The nurse renewed Gaston's Tramadol prescription and advised him to raise the issue with Obaisi at an upcoming appointment. *Id*. Gaston did not mention the injury at his appointment with Obaisi. *Id*.

Gaston next complained of hip pain to Obaisi on January 27, 2015. DSOF ¶ 59. Obaisi told Gaston that they would wait to address the issue until after his right knee surgery, which was scheduled for the following week. *Id*. In the year after the surgery, Gaston saw Obaisi frequently, but seemingly did not complain of back pain during those visits. *See* DSOF ¶ 48.

In August 2016, Gaston reported low back pain and lower extremity numbness during an appointment with Chmell. Chmell examined Gaston's lower back and ordered an x-ray of the lumbar spine, which revealed arthritis. DSOF ¶ 60. During a follow-up visit in September 2016, Chmell recommended physical therapy and core strengthening. DSOF ¶ 61. Chmell has never recommended surgery for Gaston's lower back condition, and opined in a deposition that the standard of care for treating lumbar spine arthritis is non-operative measures such as medication. DSOF ¶¶ 60-61.

### D. Hernia (Obaisi)

Gaston's last pertinent medical condition is a reducible right-sided inguinal hernia. DSOF ¶ 62. Gaston began to complain about the hernia in October 2013, but there is no evidence that Obaisi (or any other defendant) knew about it until September 28, 2014, when a nurse notified Obaisi that Gaston's hernia was painful and swollen. PSOF ¶¶ 77-78, 90; Pl. Supp. Exh. at 263. On October 7, 2014, Obaisi presented Gaston's case at a Wexford collegial review. PSOF ¶ 92. During the review, Obaisi and the consulting physician decided to delay surgical evaluation of the hernia until after Gaston's knee surgery. Pl. Supp. Exh. at 346. Instead, Gaston was given a hernia truss. DSOF ¶ 65.

On March 2, 2015, Gaston again reported discomfort from his hernia to Obaisi. DSOF ¶ 66. Obaisi elected to re-present Gaston's case at collegial review, and Gaston was approved for a general surgery consult at UIC on March 10, 2015. *Id*; DSOF Exh. D at 172. The consult took place on July 20, 2015 (more than five months after it was approved). DSOF ¶ 67. The consulting physician recommended hernia repair surgery, which was performed on August 25, 2015. DSOF ¶¶ 67-68.

### II. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating

summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). However, affidavits, depositions, and other written forms of testimony can substitute for live testimony. *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir.2014). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Exhaustion

Prisoners complaining about prison conditions—including prison medical treatment—must exhaust available administrative remedies before filing suit. 42 U.S.C. § 1997e(a); *Witzke v. Femal*, 376 F.3d 744, 751 (7th Cir. 2004). The procedures that prisoner must exhaust are defined by the prison grievance process itself, not the Prison Litigation Reform Act. *Maddox v. Love*, 655 F.3d 709, 721 (7th

Cir. 2011). Illinois's prison grievance procedures are set out in Title 20 of the Illinois Administrative Code, 20 Ill. Admin. Code § 504.800 *et seq.*

### 1. Grievance No. 0792: Left Knee

Gaston filed three administrative grievances relating to his claims in this case. The first, Grievance No. 0792, was filed sometime before May 11, 2009 and grieved the treatment of his left knee. DSOF ¶ 73. But Gaston did not timely complete the grievance appeals process. Illinois law requires an appeal to the Director of the Illinois Department of Corrections to be *received* by the Administrative Review Board within 30 days of the date of the Chief Administrative Officer's response to the grievance. 20 Ill. Admin. Code § 504.850(a). The Chief Administrative Officer signed and responded to Gaston's first grievance on May 11, 2009, but the Review Board did not receive the appeal until from the response until June 17, 2009. DSOF ¶ 73; DSOF Exh. G. at 2. In light of the missed deadline, the Review Board returned the appeal to Gaston as untimely filed. DSOF ¶ 73. Gaston's failure to comply with the appeals deadline means that he has failed to properly exhaust his administrative remedies as to the left knee condition in 2009. *See Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2013).

### 2. Grievance No. 2559: Left and Right Knees

Gaston's second grievance, filed on August 11, 2010, presents a more difficult question. In this second formal grievance, No. 2559, Gaston complained that he had been waiting over fifteen months to receive treatment for his left knee, and that his

right knee was also bothering him.[11] DSOF Exh. G at 5. The subject of this grievance was clearly the ongoing lack of medical treatment for Gaston's knee issues. *See* DSOF Exh. G at 5 ("I still have not gotten my knee fixed … I am being denied Medical treatment on my left knee which is in constant pain and no medication is being given to me … I would like to have my knees fixed after this 15 month wait."). The Review Board, however, returned the grievance as untimely, noting that the "last dated cited in this [grievance] by Gaston was '15 months' ago." DSOG Exh. G at 9 (June 22, 2011). Illinois law requires a prison grievance to be filed within "60 days after the discovery of the incident, occurrence or problem that gives rise to the grievance." 20 Ill. Adm. Code § 504.810(a). But the Review Board's rejection of the grievance as untimely is premised on a misreading of Gaston's grievance, which stated that he had been *waiting* fifteen months from the date of his injury to receive adequate treatment. He was not complaining about a single incident that happened fifteen months ago; he instead was complaining about an ongoing failure to treat by the prison's medical staff. His grievance was timely because the injury was ongoing in nature; it would be nonsensical to start the 60-

---

[11]There is a colorable argument that the second grievance does not exhaust the *right* knee claim, but Defendants have not raised it. It is somewhat unclear from the grievance whether Gaston was grieving lack of treatment for his right knee, or just pointing to his right knee pain as evidence of the harm done by failure to treat the left knee. But in their brief, Defendants treat both the right and left knee claim as one "knee condition," and so do not argue that Gaston's *right* knee claim might be unexhausted even if Grievance No. 2559 successfully exhausted his *left* knee claim. Def. Mem. at 5-6. Defendants have the burden of proving a prisoner's failure to exhaust, *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004), so the Court gives Gaston the benefit of the doubt on the question whether Grievance No. 2559 actually grieves right knee treatment (assuming that the treatment of the right and left knees are separate claims for PLRA purposes, which they might not be).

day clock from the date of his initial injury in such a circumstance, especially as he waited for treatment.[12]

Defendants appear to argue that Gaston's remedies are unexhausted because the Review Board "returned" the grievance on procedural grounds instead of issuing a final determination on the merits. *See* R. 158, Def. Mem. at 6 ("because Plaintiff never received a final determination on the merits of his grievances … he did not meet his obligations under the PLRA exhaustion requirement."); R. 185, Def. Reply. at 5. That line of thinking is imprecise. In most cases, the Review Board will issue a procedural return because the prisoner has failed to comply with state-law procedural requirements for grievances. The prisoner's claim will be unexhausted because he *actually* failed to follow the proper procedures, *not* just because the Review Board chose to issue a procedural "return" as opposed to a decision on the merits. *See, e.g.*, *Kaba*, 458 F.3d at 684 ("[W]hen the prisoner causes the unavailability of the grievance process by simply not filing a grievance in a timely manner, the process is … forfeited."). To allow the Review Board's stated rationale to be 100% dispositive would allow prison officials to evade review by issuing bogus procedural denials in order to render prisoners' complaints perpetually

---

[12] On the return form, the Review Board also stated as a reason for rejection that "[t]his office previously addressed this issue on 8/20/10"—apparently referring to the Review Boards' response to separate correspondence Gaston had sent to Stateville's director complaining about his medical care. *See* DSOF Exh. G at 3. In a rejection signed on August 20, 2010, the Review Board admonished Gaston to follow the grievance system and to contact his counselor about the issue. *Id*. at 4. This back-and-forth was separate from the formal grievance (No. 2559) that Gaston filed on August 11, 2010. And at any rate, the Review Board did not "address" Gaston's grievance in the August 20 return, but merely told him that he should follow the formal grievance process—which he did with the August 11 grievance.

unexhausted—effectively making prison grievance decisions unreviewable by federal courts. The PLRA requires that prison officials be given "a fair opportunity to consider the grievance," *Woodford v. Ngo*, 548 U.S. 81, 95 (2006), not absolute control over whether exhaustion has been satisfied. So when a prisoner *has* complied with applicable rules but the prison-review official mistakenly believes that he has not, then the prisoner has satisfied the exhaustion requirement. By following the prison's procedure, Gaston gave the Review Board a fair opportunity to address his grievance. Defendants cannot assert an exhaustion defense when the prison, not Gaston, is responsible for the failure of the grievance process. *Cf. Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004) (prisons cannot exploit the exhaustion requirement by not responding to grievances or denying access to an administrative remedy); *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016) (prisoner need not exhaust remedies when prison fails to respond to a properly field grievance or otherwise prevents the prisoner from filing); *Brown v. Croak*, 312 F.3d 109, 111-12 (3d Cir. 2002) (administrative remedies were not available when prison officials erroneously told the prisoner that he must wait until the investigation was complete before filing a grievance).

In short, Defendants have not carried their burden of showing that Gaston failed to exhaust administrative remedies for his right and left knee claims, at least as of the June 22, 2011 rejection of the grievance that had been filed on August 11, 2010.[13]

---

[13]The Court recognizes that, by denying summary judgment to the defense on this issue, the Opinion comes close to a holding that Gaston has exhausted his claims. But

### 3. Grievance No. H597: Lower Back, Hernia, Knees

Gaston filed his third formal grievance in May 2015, this time grieving that he had not received treatment for his right knee, hernia, and lower back. DSOF Exh. G at 10-11. The Chief Administrative Officer responded to the grievance on August 27, 2015, starting the clock for Gaston to complete the administrative process by appealing to the Director. 20 Ill. Admin. Code 504.850(a). But instead of appealing and awaiting a response, Gaston immediately filed his Third Amended Complaint, which added allegations about his hernia and lower back treatment. Only later did Gaston file an administrative appeal. *See* DSOF Exh. G at 12 (appeal to Director dated September 10, 2016). The Third Amended Complaint was filed on August 27, 2015. R. 102, Third. Am. Cmplt. The Review Board did not return Gaston's grievance until September 17, 2015. The problem is that Gaston jumped the gun on the lower back and hernia claims by filing the Third Amended Complaint before finishing the grievance appeals process. So he cannot proceed on them in federal court, even though he eventually finished the administrative process during the suit's pendency. *See Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004) (prisoners must exhaust their remedies *before* filing suit, even if exhaustion is completed while the lawsuit is pending).

Gaston argues that he may amend his complaint to include unexhausted claims as long as he is "properly before the court" on some exhausted claims. Pl. Resp. at 2-3. In support, he cites only *Jones v. Bock*, which flatly contradicts his

---

Gaston did not cross-move for summary judgment against the exhaustion defense. In any event, the claims fail on the merits, as discussed below.

position. *See* 549 U.S. 199, 211, 219-221 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."; "All agree that no unexhausted claim may be considered .... [I]f a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad."). And even apart from the lack of case law support, Gaston's position is nonsensical. Gaston argues that Federal Rule of Civil Procedure 15 trumps the PLRA, which is a later-enacted congressional statute. Pl. Resp. at 2-3. But a later-enacted statute of course trumps a federal procedural rule if the two are in conflict. *Harris v. Garner*, 216 F.3d 970, 982 ("If there were a conflict between Federal Rule of Civil Procedure 15 and the PLRA, the rule would have to yield to the later-enacted statute to the extent of the conflict."). What's more, Gaston's position runs against the PLRA's exhaustion rationale, which is to allow prison officials a chance to address each grievance. The aim of the PLRA would be frustrated if prisoners could use Rule 15 to bootstrap endless unexhausted claims onto a single exhausted claim. *Williams v. Adams*, 2007 WL 1595457, at *1 (E.D. Cal. June 1, 2007).

No better is Gaston's argument that it is improper to raise exhaustion on a motion for summary judgment. *See* Pl. Resp. at 2. As Defendants point out, exhaustion "most often is raised via summary judgment motion, so that the Court can consider evidence outside the pleadings, such as affidavits, grievances, responses, appeals, and related documentation." *Boyce v. Carter*, 2014 WL 4436384, at *8 (N.D. Ill. Sept. 8, 2014) (quotation marks omitted). True, this motion for

summary judgment comes at the close of all discovery, but Gaston has had ample notice that Defendants intended to argue exhaustion. Defendants asserted the exhaustion defense in their answer to Gaston's Amended Complaint, and did so again in their answers to the Third Amended Complaint. R. 68 at 10; R. 105 at 15; R. 127 at 17-18. Far from waiving the exhaustion defense, Defendants have diligently asserted it from the start.

So Defendants are entitled to dismissal of the hernia and lower back claims on exhaustion grounds alone. A court may choose, however, to address the merits of an unexhausted claim even after determining that the claim is unexhausted. *Fluker v. Cty. of Kankakee*, 741 F.3d 787, 793 (7th Cir. 2013). For the sake of completeness—and for appellate review—it often makes sense for a district court to proceed to the merits of an exhausted claim when the claims are fully briefed and plaintiff has had a "full and fair opportunity to respond to the substance of the motions." *Id*. In this case, the lower back and hernia claims are fully briefed, so the Court will consider these claims on the merits even though they are unexhausted.

### B. Deliberate Indifference

Prison doctors violate the Eighth Amendment when they act with "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Defendants do not contest that Gaston's medical conditions were "serious," so the question is whether a reasonable jury could find that any of the defendants acted with deliberate indifference. Deliberate indifference is more than mere negligence or medical malpractice. *Collignon v. Milwaukee Cty.*, 163 F.3d 982,

988 (7th Cir. 1998); *Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008). Physicians may be liable if they intentionally disregard a known, objectively serious medical condition that poses an excessive risk to an inmate's health. *Gonzalez v. Feinerman*, 663 F.3d 311, 313-14 (7th Cir. 2011) (per curiam). A jury can infer deliberate indifference on the basis of a physician's treatment decision when the decision is so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). A significant delay in medical treatment may also support an inference of deliberate indifference, especially when the result is prolonged and unnecessary pain. *See Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

The Court will march through the record in a moment, but it is worth summing up that, even giving Gaston the benefit of reasonable inferences, the treatment decisions in this case were not so manifestly unreasonable that a reasonable jury could infer—without additional evidence—that they amounted to deliberate indifference on the part of a particular Defendant. To be sure, Gaston *has* pointed to evidence of long, unexplained delays in treatment, which might on their own have supported a deliberate-indifference claim—*if* Gaston had identified the person or party responsible for the delays. But—as detailed in the remainder of the Opinion—Gaston has not shown *which* of the named defendants caused the delays, so his arguments based on delay also fail for lack of evidence.[14]

[14]Because the Court holds that Gaston has not set out sufficient evidence to prove a claim of deliberate indifference against any defendant, we need not address the issue of qualified immunity. But the Court notes that, contrary to Defendants' assertions, *see* Def. Mem. at 20, qualified immunity does not apply to private medical personnel in prisons.

## 1. Dr. Zhang

First up is Dr. Zhang. Zhang saw Gaston in connection with his left-knee complaint on two occasions.[15] At the first appointment, in November 2009, she prescribed Ibuprofen and analgesic balm for Gaston's knee pain. DSOF ¶ 10; DSOF Exh D. at 3. Zhang saw Gaston again in April 2010, when he presented for the Hypertension and Asthma Chronic Clinics. DSOF ¶ 11. According to Gaston, Zhang refused to examine his knee at this appointment, and told him "I don't want to talk to you about that. That ain't what you're here for." DSOF Exh. B at 35:24-36:5. But there is undisputed evidence that Zhang did offer some treatment for the knee, prescribing Tramadol (a different pain reliever) and analgesic balm. Def. Resp. PSOF ¶ 11. Zhang also instructed Gaston to follow up at the clinic. PSOF ¶ 13. Gaston also claims that Zhang told him on one occasion, "I'm not treating you, and I'm not letting you see no specialist." DSOF Exh. B at 56:19-21.

Zhang's behavior presents a close call, but ultimately there is not enough evidence in the record to support a reasonable inference of deliberate indifference. It is true that the Seventh Circuit's opinion on the dismissal motion in this case held that Zhang's behavior *as described in Gaston's complaint* could support a deliberate indifference claim. *Gaston v. Ghosh*, 498 F. App'x 629, 632 (7th Cir. 2012). But the

---

*Petties v. Carter*, 836 F.3d 722, 734 (7th Cir. 2016); *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 794 (7th Cir. 2014). Notably, *Petties* and *Carter* both involved *Wexford* employees. To be sure, there might be some form of good-faith defense, but Defendants do not develop that argument at all.

[15]Gaston also states that he saw Zhang on December 14, 2011. PSOF ¶ 57. This assertion is inconsistent with the cited record: the entry for December 14, 2011 is labeled "PA note," indicating that Ghosh was seen by a physician's assistant (probably Williams), not by Zhang, who is an M.D. DSOF ¶ 3. The handwriting and signature for the December 14 entry also do not match Zhang's.

Seventh Circuit did not have the benefit of Dr. Chmell's deposition testimony, which illuminates the standard of care for a condition like Gaston's. Chmell's uncontroverted testimony states that the usual course of treatment for Gaston's condition is to attempt non-operative measures, like pain medication, before going forward with surgery. DSOF Exh. E at 14:11-15. Given the preference for non-operative treatment, Zhang's decision to provide painkillers instead of pursuing other treatments did not manifestly fall below the standard of care, let alone sink to the level of deliberate indifference.

What's more, Gaston's complaint alleged that during the April 2010 appointment, Zhang refused to even discuss Gaston's knee, let alone treat it. *See Gaston*, 498 F. App'x at 632. But from the evidence on the record, it is uncontroverted that Zhang *did* treat Gaston's knee, even though she did not refer him to a specialist. At the first appointment (in November 2009), she examined the knee and noted that it was not bruised and that Gaston had full range of motion. DSOF Exh. D at 22. Zhang prescribed him Ibuprofen, which was a different pain reliever than what he had been taking before, and told him to follow up if he was still in pain. *Id*. Zhang apparently did not herself schedule this follow-up appointment, *see* PSOF ¶ 10, but Gaston points to no evidence in the record as to what happened, and it is not clear what Gaston did, if anything, to pursue this issue in discovery. Deliberate indifference requires a *conscious* disregard of a serious medical need. For all we know, Zhang negligently forgot to make the appointment, or there was a miscommunication in who was supposed to initiate the follow-up

appointment, or perhaps Zhang was not even the person responsible for scheduling follow-up appointments. Yes, Gaston is entitled to the benefit of reasonable inferences, but he does not cite to actual record evidence to establish even the bare constituent facts *from* which to draw an inference of *deliberate* indifference. *See Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) ("isolated instances of neglect" cannot support a finding of deliberate indifference). When Zhang saw Gaston in April 2010 and he was still in pain, she changed treatment course and prescribed yet another pain reliever—this one an opioid used to treat moderate to severe pain. DSOF ¶ 11. Gaston asserts that Zhang refused to discuss his knee (an assertion that must be credited at this stage), but given that Gaston's appointment was at the Hypertension and Asthma Clinic, Zhang's refusal to discuss his knee in detail is understandable: as she told Gaston, he was at the clinic for a different reason. And Zhang did not merely turn Gaston away; she prescribed the different pain reliever and told him to return to the clinic to address the knee, which he did a few weeks later. DSOF ¶ 12 (noting that Gaston saw Williams on May 7, 2010).

Gaston also complains that Zhang did not refer him to an outside specialist, *see* PSOF ¶¶ 10-11, but there is simply no evidence that an outside specialist visit was medically indicated at the time. On Gaston's version of the facts, Zhang was negligent and rude, but there is not enough evidence to infer that her treatment was "so inadequate … that no minimally competent professional would have so responded under those circumstances." *Arnett*, 658 F.3d at 751 (7th Cir. 2011) (quoting *Roe v. Elyea,* 631 F.3d 843 (7th Cir. 2011)) (quotation marks omitted).

## 2. Dr. Ghosh

Moving on to Ghosh, he appears to have been aware of Gaston's knee condition since July 21, 2009, when he saw Gaston and either noted that Gaston was wearing knee braces or planned to give him knee braces (the record is unclear). *See* Pl. Supp. Exh. at 16. But there is no evidence that Gaston told Ghosh about his symptoms or previous treatment at this appointment. Nor is there evidence that Ghosh knew that Gaston continued to suffer in the months leading up to their next encounter in May 2010. Gaston states that he wrote letters to Ghosh complaining of knee pain, see PSOF ¶ 30, but it is unclear when these letters were sent and whether Ghosh actually received them, as detailed earlier in this Opinion, *see supra* at 6.

When Ghosh did see Gaston again in May 2010, Ghosh took action by planning an outside orthopedic referral. DSOF ¶ 13. For some reason, it took Ghosh two months to get around to actually approving this referral. *See* PSOF ¶ 17. Of course, ideally there would not have been a two-month wait for the referral. But Gaston offers no evidence to explain why a scheduling delay of that length, standing alone, is enough to support an inference of deliberate indifference, especially given that Gaston's knee pain did not require immediate intervention. *See* DSOF Exh. E at 20:12-16; *Gutierrez* 111 F.3d at 1375. Perhaps some expert evidence would have helped Gaston cross the divide between the current record and a reasonable inference of deliberate indifference, or even just engaging in some discovery to

understand the cause of the two-month delay. But Gaston does not offer that evidence.

It is true that there was another period of delay between Wexford's approval of the specialist referral and Gaston's first appointment with Chmell, *see* PSOF ¶ 18; DSOF ¶ 14, but there is no reason to think *Ghosh* was the one responsible for the delay. Gaston has not provided evidence, for example, that Ghosh was in charge of scheduling offsite consults, or that he stonewalled someone else's scheduling of the consult. The delay could just as easily have been caused by an administrative snafu at Wexford, or by scheduling difficulties at UIC. For example, Chmell holds a Monday clinic to see patients, and on those days he sees around 90-100 patients (usually 2 or 3 are inmates). DSOF Exh. E at 8:22-23. Chmell also performed 158 knee replacements in calendar year 2016. *Id.* 11:7-8. It is entirely possible that Chmell's busy schedule was the cause of the holdup. Perhaps some discovery efforts would have uncovered a connection between Ghosh and the referral delay, but Gaston does not offer any evidence.

There was another long gap before Gaston got the MRI that Chmell ordered, but again, there is no indication that this was *Ghosh*'s fault. Ghosh ordered the MRI the day after Gaston's appointment with Chmell, PSOF ¶ 28, and Wexford collegial review approved the MRI about a month later. PSOF ¶ 29. The several-month delay that followed is entirely unexplained, so there is no evidence for a jury to infer that Ghosh himself was responsible. *See, e.g.*, *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (summary judgment in favor of doctor was appropriate where

"[plaintiff's] sole complaint about [the doctor was] the delay between the initial visit, the diagnosis, and the visit to the specialist" and plaintiff "presented no evidence that these delays were even within [the doctor's] control."); *Baker v. Wexford Health Sources, Inc.*, 118 F. Supp. 3d 985, 996-97 (N.D. Ill. 2015) (granting summary judgment in favor of defendant physicians where there was no evidence they were responsible for delays scheduling surgery and specialist visits, even though one at least one of the doctors was aware of the lengthy delays).

Contrary to Gaston's assertion in his response brief, the Seventh Circuit has not already "ruled" that Ghosh's actions constitute deliberate indifference. *See* Pl. Resp. at 1. The Seventh Circuit held that the two-year delay between Gaston's injury and his surgery was sufficient to state a claim against Ghosh. But the complaint blamed Ghosh for the delays, and at the dismissal motion stage, that was taken as true. At the summary judgment stage, *evidence* is required, and the record evidence now does not justify holding Ghosh responsible. *See Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (holding that plaintiff had stated a claim of deliberate indifference against a physician based on long delays between specialist visits, but noting that "a more complete examination of the facts may show that … someone else was responsible for the alleged delays."). For example, taking the complaint's allegations as true, it was natural to blame Ghosh for refusing to authorize surgery, *Gaston*, 498 F. App'x at 632, but post-discovery there is no evidence at all that *Ghosh* delayed surgical authorization. In fact, it appears that Ghosh recommended the surgery to the Wexford collegial review. Pl. Supp. Exh. at 301. The factual

record now is substantially different from the facts alleged in the complaint, and it does not permit a reasonable jury to find that Ghosh was deliberately indifferent.

### 3. Dr. Carter

Gaston's main complaints about Carter's care are that (1) Carter did not effectuate Gaston's prescription for physical therapy after his left knee arthroscopy and (2) Carter delayed treatment of Gaston's right knee. *See* Pl. Resp. at 7-8. Neither of these complaints support a deliberate indifference claim against Carter.

First, when it comes to the physical therapy, there is no evidence that Carter was the person responsible for making sure that Gaston received physical therapy. Again, discovery might have uncovered who was responsible for ensuring that Gaston received the therapy, but if it did, Gaston does not point to the evidence. ven if Carter was responsible for the lapse, there is no evidence that the lack of physical therapy harmed Gaston. After his recovery from the left knee surgery, Gaston did not complain of left knee pain for over four years. DSOF ¶ 51. It would be unreasonable to infer, without more evidence, that Gaston's complaints of left knee pain in 2015 were due to lack of physical therapy four years earlier—especially because Gaston has osteoarthritis, which tends to naturally worsen over time. *See* Exh. E at 42:11-16.

Carter's decision to delay treatment of Gaston's painful right knee also does not support an inference of deliberate indifference, at least on this record. The medical records show that Gaston complained to Chmell of right knee pain during the August 8, 2011 follow-up visit for his left knee surgery. DSOF Exh. D at 23.

Chmell ordered Gaston to return in two or three weeks and noted that he would "likely order an MRI of his right knee at his next visit." *Id*. On August 25, 2011, Carter saw Gaston and noted in his medical records that there was "[n]o current indication for [right] knee evaluation." DSOF Exh. D at 24. Gaston continued to complain about right knee pain, but in November 2011, Carter and the Wexford collegial review denied Gaston's request for an MRI, deciding to wait six months "to allow surgically repaired left knee to recover." DSOF Exh. D at 25. At Gaston's next appointment with Carter in February 2012, Carter noted that Gaston was unable to bear weight on his right knee, but reminded him of the plan to delay the MRI for six months. DSOF Exh. D at 26.

Unfortunately for Gaston, there is nothing in the record to support a conclusion that Carter's decision to delay evaluation of the right knee was not the product of reasoned medical judgment. "[T]he Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, such as disagreement over whether one course of treatment is preferable to another." *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017). No evidence suggests that Carter's decision to countermand Chmell's suggestion that Gaston return for a right knee evaluation was not based on Carter's independent medical judgment about a course of treatment. Similarly, no evidence demonstrates that it was medically unreasonable to delay the right knee evaluation until the left knee recovered from the surgery. Of course, one could speculate in the other direction—if Gaston was already essentially non-weightbearing on his right leg, why not bite the bullet and

move forward with surgery?—but the decision is not so self-evidently wrong that a jury could reasonably conclude that it was "far afield of accepted professional standards." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Gaston might contend that he should not have to retain a medical expert to rebut Carter's judgment. It is of course true that a plaintiff claiming medical mistreatment need not always engage a medical expert. In some cases, courts and juries will have no trouble inferring that a treatment decision or delay comprised deliberate indifference even without outside evidence. *See, e.g.*, *Grieveson v. Anderson*, 538 F.3d 763, 789 (7th Cir. 2008). But that is not this case. Consider a jury deliberating on this record: what would a juror point to in response to Carter's medical judgment that it was better to wait for the left knee to heal before treating the right knee? It cannot be inferred from the medical record alone that Carter fell below the constitutional minimum, so Gaston must carry his burden by providing *some* evidence that the treatment was so unreasonable as to amount to deliberate indifference. He did not.

It is worth noting, again, that the Seventh Circuit's opinion on the dismissal motion does not control this decision at the summary-judgment stage. At the dismissal-motion stage, Gaston alleged that Carter ignored Chmell's postoperative instructions (about the physical therapy) and told Gaston that the MRI of his right knee would be delayed for another year. *See Gaston v. Ghosh*, 498 F. App'x 629, 631 (7th Cir. 2012). But at this summary-judgment stage, there is no evidence that Gaston was actually harmed by the failure to carry out Chmell's physical therapy

instruction. And the decision to delay the right knee MRI is now explained by Carter's plan (supported by the Wexford collegial review) to allow the left knee to heal first. Gaston's allegations against Carter certainly were sufficient to state a claim, but he has not backed them up with enough evidence to survive summary judgment.

### 4. Dr. Obaisi

Last up of the physician defendants is Dr. Obaisi, Stateville's current medical director. Gaston claims that Obaisi was deliberately indifferent to Gaston's right knee condition, lower back condition, and hernia. As discussed earlier in the Opinion, the lower back and hernia claims are not exhausted, but the Court will address them (as well as the right knee condition) for the sake of completeness.

### a. Right Knee

First, the right knee. Upon becoming medical director of Stateville, Obaisi approved Gaston for a right knee arthrosopy, which took place in October 2012. DSOF ¶ 29-30. When the arthoscopy did not alleviate Gaston's discomfort even after several months of physical therapy, Obaisi referred Gaston for another orthopedic consult at UIC. PSOF ¶ 69. This consult was approved by collegial review on January 7, 2013, but Gaston did not see the orthopedist, Chmell, until June 2013. DSOF ¶¶ 36-37. There is no evidence explaining why it took so long to schedule this appointment, but neither is there evidence that Obaisi was responsible for the scheduling delay.

When further treatment still failed to help, Chmell recommended a right knee replacement, which was approved by Obaisi and Wexford within a month. DSOF ¶ 39; PSOF ¶ 79. The knee replacement surgery did not take place until February 2015—more than fifteen months after it was approved. But again there is no evidence that the delay was caused by *Obaisi*. At least some of the long wait is attributable to the necessity of clearing Gaston for surgery with UIC's cardiology and pulmonary departments. DSOF ¶ 41. It is unclear when Gaston was actually cleared for surgery, but all agree that it took until at least late May 2014. PSOF ¶ 86. Assuming Gaston was cleared in late May 2014, it is disturbing that he waited nine months after that to have the surgery. But again, there is no evidence that *Obaisi* caused the delay. Obaisi did note in September 2014 that Gaston still had not been called to UIC for surgery, PSOF ¶ 91, but Obaisi's *knowledge* of the delay does not establish that he *caused* the delay. *See Baker*, 118 F. Supp. 3d at 996-97.

Aside from the delays in care, there is no evidence that Obaisi's treatment of Gaston's knee was deliberately indifferent. Obaisi provided Gaston with medical permits and medication before and after the surgery, and he checked in on Gaston frequently in the year after. *See, e.g.*, DSOF ¶ 36, 48, 52. All in all, the only clear problems with Gaston's knee treatment during Obaisi's tenure were the long holdups scheduling follow-ups and surgery, and there is no evidence that Obaisi was responsible for those delays.

### b. Lower Back

Next up is Gaston's lower back condition. Gaston first raised this problem with Obaisi in February 2014, when Gaston reported numbness in his left thigh. DSOF ¶ 55. Obaisi immediately ordered x-rays, which revealed degenerative joint disease. DSOF ¶ 55; DSOF Exh. D at 154-55. When Obaisi met with Gaston the next month, Obaisi scheduled him for a steroid injection, which was soon performed. DSOF ¶ 57. Gaston injured his back and complained of sciatica during summer 2014, but there is no reason to think that Obaisi knew about these complaints. *See* DSOF ¶ 58; PSOF ¶ 95. All in all, there is little reason for Gaston to complain about Obaisi's treatment of his lower back through the end of 2014: Obaisi provided treatment (x-rays and a steroid injection) promptly upon learning about Gatson's back pain, and had no idea that Gaston was still having back issues after that.

Gaston next complained of hip pain during an evaluation with Obaisi in January 2015. Obaisi did not evaluate Gaston's spine condition at that point, but rather told him that they would address the issue after the knee replacement (which was scheduled for the next week). DSOF ¶ 59. In his affidavit, Obaisi opined that it was "medically appropriate" to defer evaluation of the back condition until Gaston had recovered from knee surgery because Gaston "would not be able to perform activities of daily living while recovering from knee and spinal surgery at the same time." DSOF Exh. C at ¶ 12. This explanation does not elaborate on what "activities" would have been limited by surgery on Gaston's lower back. In any event, Gaston waited for over a year to get Chmell's opinion on his back pain. There is no evidence that, during this time period, Gaston was complaining to Obaisi

about back pain during, even though Gaston was seeing Obaisi every couple of months to follow up on his knee recovery. *See* DSOF ¶ 50. In the end, Chmell did not recommend back surgery, but instead recommended physical therapy for core strengthening. DSOF ¶ 61.

The analysis here is very similar to the analysis of Carter's decision to delay treatment of Gaston's right knee while the left healed. On Obaisi's side, he offers the medical opinion, via his affidavit, that it was "medically appropriate" to defer evaluation of the back condition until Gaston had recovered from knee surgery, so as to avoid putting Gaston through simultaneous recoveries for both knee and back surgery. DSOF Exh. C at ¶ 12. It is certainly possible to question that judgment, but remember that Gaston, in response, does no more than point to the medical record and ask the Court to infer that Obaisi's decision to delay was deliberately indifferent. *See* Pl. Resp. at 10-11. Without counter-evidence, and in light of the standard for deliberate indifference, a decision to delay treatment must be so far off the mark that no "minimally competent professional" would have acted that way. *Arnett*, 658 F.3d at 751. Obaisi's decision to wait is not self-evidently negligent, let alone deliberately indifferent.

### c. Hernia

Gaston's final claim against Obaisi is that Obaisi failed to treat his hernia. Gaston first complained about the hernia in October 2013, but there is no evidence that Obaisi knew about it until September 28, 2014. *See* PSOF ¶¶ 77-78, 90. After being notified about the hernia, Obaisi responded in less than two weeks by

presenting Gaston's case for collegial review on October 7, 2014. DSOF ¶ 65. At the review, it was decided that surgical evaluation of the hernia would be delayed "pending patient's knee arthroscopy,"[16] and that Gaston would be referred to a surgeon regarding his hernia after the knee surgery. Pl. Supp. Exh. at 346. And indeed, only a month after Gaston's right knee arthroplasty, Obaisi re-presented Gaston's case at collegial review, and Gaston was approved for a general surgery consultation. DSOF ¶ 66. There was a five-month delay between this approval and the consultation, R. 173, Pl. Resp. DSOF ¶ 67, but here again there is no evidence that *Obaisi* caused the delay.

The analysis here is identical to the analysis of Obaisi's decision to delay treatment of Gaston's lower back—even down to Obaisi's word-for-word assertion that the delay was appropriate because dual surgical recoveries would prevent Gaston from performing "activities of daily living." DSOF Exh. C at ¶ 17. Again, although Defendants have provided only Obaisi's affidavit,[17] Gaston has elected to stand on the medical records only, and provided no other evidence that Obaisi's decision was medically unsound. Because the decision to delay treatment for the hernia was not self-evidently wrong, and Gaston has provided no evidence suggesting that Obaisi's course of treatment fell below the constitutional minimum, Obaisi is entitled to summary judgment on the hernia claim.

---

[16]This appears to be a typo, because at the time Gaston was awaiting right knee arthro*plasty*, not arthroscopy.

[17]In their Statement of Facts, Defendants point to an article published in the *Journal of the American Medical Association* article to support the contention that "watchful waiting" is a reasonable alternative to surgery when it comes to treatment of reducible hernias. DSOF ¶ 63; DSOF Exh. F. But Defendants present very little explanation about the article, so the Court gives it little weight.

## 5. Wexford

Under the law of the Seventh Circuit, private corporations acting under color of law are liable under the standard laid out in *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). *Shields v. Ill. Dept. of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014).[18] This means that Wexford is only liable if the unconstitutional actions of its agents were caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of acts (or failures) that together raise the reasonable inference of a policy, custom, or practice. *Id.* at 796.

Gaston points to two Wexford "policies" as meeting the *Monell* standard. First, he argues that Wexford had a "policy of treating only one condition at a time, no matter the severity of the untreated problem." Pl. Resp. at 1. But Gaston has no evidence that this so-called *policy* actually exists, apart from the record of his *own* treatment.[19] Gaston encountered the one-at-a-time treatment decision three times.[20] Standing alone, those three times do not amount to a policy, custom, or practice under the *Monell* standard. *See Shields*, 746 F.3d at 796 (isolated incidents

---

[18]In *Shields*, a Seventh Circuit panel stated that it would consider overruling *Iskander v. Village of Forest Park*, 690 F.2d 126 (7th Cir. 1982), and its progeny, which rejected holding private corporations liable under a *respondeat superior* theory. *Shields*, 746 F.3d at 789. But the panel did not overrule *Iskander*, and private corporations sued under § 1983 continue to be liable only under the *Monell* standard for municipal liability. *Id* at 795-96.

[19]Gaston did supply an expert report prepared by a court-appointed expert in *Lippert v. Godinez*. But this report is inadmissible hearsay, and cannot be considered as evidence. *Diaz v. Chandler*, 2016 WL 1073103, at *1 (N.D. Ill. Mar. 18, 2016); *Mathis v. Carter*, 2017 WL 56631, at *4-5 (N.D. Ill. Jan. 5, 2017). And even if it were admissible, the *Lippert* report lends no support to Gaston's claim that Wexford had a "one-at-a-time" policy for treating medical conditions.

[20]The three times were (a) Carter as to the right knee, waiting for the left knee's post-surgery recovery; (b) Obaisi as to the lower back condition, waiting for the knee surgery recovery; and (c) Obaisi as to the hernia, waiting for the knee arthroplasty.

did not add up to a pattern of behavior that would support an inference of a custom or policy). To be sure, if the conditions were so disconnected from one another, or so serious, that it made no sense to delay treatment, then perhaps a fact-finder could reasonably attribute the physicians' decisions to some overall Wexford policy. For example, if an inmate was suffering from the stomach flu and receiving treatment for it, and then the inmate broke his leg, obviously there would be no reason for a physician to delay treatment of the leg just because the flu was being treated. That is not this case, as discussed earlier in reviewing the record evidence of the decisions made by Carter and Obaisi. Nowhere does Carter or Obaisi attribute the decision to delay treatment on a Wexford policy to always treat just one condition at a time. And even if there was a policy like that, Gaston has not shown that it caused unconstitutional acts by Wexford's agents. As discussed earlier, the instances of deferred treatment did not rise to the level of deliberate indifference, and so did not violate the Constitution.

Gaston's second *Monell* theory is more specific, namely, that Wexford's written hernia policy mandates that reducible hernias will not be repaired, regardless of how painful they are. Pl. Resp. at 11. But the copy of Wexford's hernia policy provided by Gaston does not support this characterization. The policy *does* say that patients with reducible hernias are not "in general" candidates for hernia repair surgery, but it also admonishes that "[d]ecisions … must be made on a case-by-case basis," and that its recommendations "are intended only as a guide for the site physician." R. 187-3, Pl. Rule 56.1 Exhibits, Wexford Hernia Policy. There is no

evidence in the record that Wexford's official policy is to deny surgery to all patients with reducible hernias regardless of pain, and Gaston has provided no evidence that Wexford has an unofficial policy, custom, or practice along those lines. Because Gaston has not provided evidence of a corporate policy, custom, or practice that meets the *Monell* standard, Wexford is entitled to summary judgment on all claims.

## IV. Conclusion

Gaston has not put forward enough evidence for a reasonable jury to conclude that any of the physicians were deliberately indifferent to his serious medical needs. Nor has he successfully demonstrated the existence of a Wexford policy, custom, or practice that caused the alleged violations of his constitutional rights. Summary judgment on the merits is therefore entered in favor of each defendant and against Gaston.

ENTERED:


s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 28, 2017